### KEYSTONE WOOD CO. v. SUSQUEHANNA BOOM CO.

(Circuit Court of Appeals, Third Circuit. March 8, 1917.)

No. 2174.

1. NAVIGABLE WATERS ⬳22(1)—OBSTRUCTION—DAMS.
     The franchise or privilege of damming back the waters of a navigable stream can be granted only by the state.
     [Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 100–102, 108–113, 115.]

2. EVIDENCE ⬳29—JUDICIAL NOTICE—LEGISLATIVE ACTS OF STATES.
     The federal court will take judicial notice of state legislative action making a river within the state a public navigable stream and authorizing the damming of one of its branches.
     [Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 36, 37, 39, 43–46, 48.]

3. CORPORATIONS ⬳613(1)—FORFEITURE OF FRANCHISE BY NONUSER—COLLATERAL INQUIRY.
     A boom company, incorporated under Act Pa. March 26, 1846 (P. L. 190), constructed a dam across a navigable river under the authority of the supplemental act of December 11, 1866 (P. L. 1867, p. 1535). The latter act required the filing of a bond conditioned to indemnify riparian owners for the flooding of their lands. Long after the construction of the dam, the boom company ceased to conduct the business for which it was incorporated; the company being incorporated to facilitate the rafting of logs from lands reached by the river on which its dam was located. While the timber of the district was largely exhausted, reforesting was in process. A riparian owner sued for damages for the flooding of, his land; the state having refused to institute proceedings for the forfeiture of the company's franchise. *Held* that, as it must be presumed that riparian owners were indemnified for the flooding of their lands, no recovery could be had, for it could only be based on a theory of the for-

feiture of the boom company's franchise, which question could not be collaterally raised by private individuals.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2431–2434.]

4. COURTS ☞365—FEDERAL COURTS—PRECEDENCE.

While the federal court having jurisdiction in a particular state is an independent forum, and distinct from that of the state, yet it administers no different law than that administered by the state courts, and in a question involving state public policy should defer to the decisions of the state courts.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 950, 952, 955, 969–971.]

In Error to the District Court of the United States for the Middle District of Pennsylvania; Charles B. Witmer, Judge.

Action by the Keystone Wood Company against the Susquehanna Boom Company. There was a judgment for defendant on demurrer to plaintiff's statement (235 Fed. 800), and plaintiff brings error. Affirmed.

Certiorari denied by Supreme Court.

Mortimer C. Rhone, John G. Reading, and H. T. Ames, all of Williamsport, Pa., for plaintiff in error.

Max L. Mitchell and N. M. Edwards, both of Williamsport, Pa., for defendant in error.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

BUFFINGTON, Circuit Judge. In this case the Keystone Wood Company, a corporation of New Jersey, brought suit against the Susquehanna Boom Company, a corporation of Pennsylvania, to recover damages in excess of $3,000 suffered by the alleged illegal flooding of its land by a dam which the Boom Company maintained. The defendant, justifying its right to maintain such dam under certain statutory authority of the state, submitted that legal question to the court below in an affidavit of defense which in substance was a demurrer. The court, after hearing, filed an opinion reported in 235 Fed. 800, which sustained the Boom Company's contention, and in pursuance thereof entered judgment in favor of defendant, whereon plaintiff took this writ.

[1-3] While in form what is here involved is a claim for damages for flooding certain land, the real issue is the further existence of a dam across the West branch of the Susquehanna river near the city of Williamsport, Pa. The pool formed by this dam extends upwards of 9 miles on the stream. A recovery in this case would be the forerunner of cases by other owners, and the dam in question would have to be abandoned. It is therefore apparent that the real thing here involved is the existence of the dam, since recovery by this plaintiff virtually means its destruction.

The defendant's right involved in this case is not the physical dam itself, but a property right which was vested before the dam was built, namely, the franchise or privilege of damming back the waters of

a large stream. Power to obstruct a stream like the Susquehanna river could be granted only by the state. If for its own purposes the state sees fit to grant such right, it would seem to follow that the state and it alone should determine how long its grant should continue, and whether and when it should be withdrawn, and that no mere private interest should, in a private suit, and without a notice to the state, put an end to a power which the state had called into being.

Turning, then, to the action of the state of Pennsylvania, we take judicial note that by due legislative action the state has made this part of the Susquehanna river a public navigable stream; and that the West branch of that stream was the main artery for marketing the great timber field of the Central Pennsylvania watershed. To further the marketing of its timber, the state by the act of assembly of March 26, 1846 (P. L. 190), incorporated the Susquehanna Boom Company, and authorized it to construct booms on the West branch and to charge certain rates for all timber handled. By the supplemental act of December 11, 1866 (P. L. 1867, p. 1535), the same company was given the franchise to erect and maintain a dam across the river at Williamsport, and in pursuance thereof this dam was built and is now maintained. This supplemental act provided that before building the dam the Boom Company should file a bond in $150,000, conditioned to indemnify riparian owners against damages for flooding their lands.

As the land here involved has been flooded by the dam pool for upwards of 50 years, and as there is no assertion of any protest or objection by its successive owners, we are warranted in assuming that due compensation was made by the Boom Company for the exercise of its easement of flooding said land, by virtue of a proceeding under the bond or by adjustment and conveyance between the parties. The franchise to erect the dam being then conferred on the Boom Company without time limitation by the state, and the easement to flood the locus in quo having been duly paid for and acquired from the predecessor in title of the plaintiff, the burden of showing that such franchise has been in some lawful manner terminated rests on the latter. It was stated at bar that at the instance of the present plaintiff a proceeding had been begun by the state of Pennsylvania at the instance of the Attorney General to vacate and forfeit this franchise. It was also stated that this proceeding was subsequently withdrawn by the state.

The case therefore resolves itself into the question whether, when the state had refused to vacate or annul a franchise it has granted, can such franchise be vacated or annulled at the instance of a private person, in a suit or proceeding to which the state is not a party? The plaintiff claims such right, and sets up as a ground of forfeiture a nonuser or abandonment of its franchise by the Boom Company. In that regard the allegation in the statement of claim is that about July 1, 1910, the Boom Company "ceased to do business as a boom company, the purpose for which it was chartered, and abandoned said dam for the use and purpose for which it was authorized to erect it."

Assuming for present purposes, as thus alleged, the nonuser of its

dam by the Boom Company for boom purposes, has the defendant the right in this suit to have the franchise vacated and annulled, for that, as we have seen, would be the practical effect of a judgment in its favor if the plaintiff recovers. We are of opinion the plaintiff has no such right, and the reason and spirit of the decisions of the highest court of Pennsylvania are to that effect.

From an examination of the legislation of Pennsylvania it will be seen that the chartering of this Boom Company and the subsequent legislation applying thereto constituted an important part in the development of the resources and industries of the state, and that the operation of this company was a subject of widespread interest, and such as peculiarly called for the exercise of the sovereign power of the state. The great watershed of which this branch of the Susquehanna was the only outlet was heavily timbered, and along it and the main river, clear to tidewater, timber was floated. While we may, for present purposes, assume the Boom Company has stopped booming logs, yet we can well take judicial notice of the fact that some timber is still carried to market down this branch; that the dam pool, with some 9 miles of slackwater, affords a safe harbor in transit for lumbering operations; that, as provided in the act of 1866, such dam has "a proper and suitable chute, not less than sixty feet in width, for the safe running of rafts," etc.; that a great reforesting and conservation work is now being carried on in the state in this watershed, which may hereafter call for the use of this dam in marketing such timber; that riparian owners, abutting 18 miles of this slackwater pool, have no doubt in the past 50 years of the dam's existence adjusted themselves to the pool as a permanent condition; and all these facts and considerations may possibly constitute grounds sufficient to warrant the state in refusing to vacate this franchise and abate this dam.

At any rate, it is apparent that this matter is one of such widespread interest that it should be treated as one of broad public concern and action, and should therefore be under permanent public control, rather than one that could be controlled at the instance of a private suitor and according to the views of a particular court and a particular jury. We note these facts, not to justify the public control of the state of Pennsylvania over the corporate creatures of its own creation and their franchise, but as showing the situation is such that it is reasonable to expect the courts would, when such question arose, naturally and properly hold that the state, and the state alone, should, in the nature of things, have exclusive control of the franchises it has granted. Indeed, seeing that the justification of a franchise grant by a state is that it is to the interest of the state that such grant of a public sovereignty should, for the time being, be exercised by private parties, it logically follows that the state should, for the same reasons, keep within its control the right of determining how long the public good warranted that public right should be continued.

[4] The question, then, being one of state policy, the case is peculiarly one in which the federal courts, exercising jurisdiction in such state, should ascertain what the highest courts of the state have

held as to such policy, for as said by this court, speaking by Judge Gray in Snare v. Friedman, 169 Fed. 11, 94 C. C. A. 379, 40 L. R. A. (N. S.) 367:

"Though a United States Circuit Court, having jurisdiction in a given state, is an independent forum, and distinct from that of the state, it administers no new or different law from that administered in the state court."

Turning to the state decisions, we find in Irvine v. Lumberman's· Bank, 2 Watts & S. (Pa.) 190 (1841), the earliest reference to this policy of Pennsylvania. This was a suit by the Lumberman's Bank on a note given to it by the defendants. To sustain its case, the bank gave in evidence· its charter which specified certain things, failing to do which the charter was absolutely null and void, and· from thenceforth the bank should be taken as dissolved, unlawful, and unincorporated. To an attempt of the defendants to set up the bank's noncompliance with these conditions, and a consequent alleged forfeiture of its charter, the Supreme Court made answer as follows:·

"These prohibitions and restrictions are very positive, and expressed in strong language; and if the bank had omitted or neglected to comply with them, and the proper steps had been taken, the charter would have been declared by the proper authority null and void. But the difficulty which meets the defendants is that we cannot judicially know, nor can we now investigate, the truth of these allegations; for, ·if there be anything settled beyond all cavil and controversy, it is that the violation of a charter of incorporation cannot be made the subject of judicial investigation in a collateral suit. The only evidence competent to prove the forfeiture of a charter, is the judgment of a court directly on the point; and no inferior evidence can be admitted for that purpose, unless it is otherwise directed by the Legislature in express and positive terms."

It will thus be observed that this case in substance holds that authority to forfeit a charter arises only by express legislative enactment. A study of the subsequent decisions of the state fails to disclose any recession from this early decision. On the contrary, we find it constantly cited, followed, and approved. In Dyer v. Walker, 40 Pa. 160 (1861), the Supreme Court so followed, saying:

"On the trial of this action of assumpsit, a plea involving the forfeiture or invalidity of the charter of the Turnpike Road Company, for some want of performance by the company, or agents of the state, .was demurrable, or might have been treated as a nullity by the court. The validity of charters cannot be tried in this collateral way. Irvine v. Lumbermen's Bank, 2 Watts & S. (Pa.) 204. Consequently the court was right in refusing to affirm the plaintiff's point."

Western Pennsylvania R. R. Co.'s Appeal, 104 Pa. 406, involved the right of the parties to that suit to question certain charter powers granted under a special act of assembly not here involved. But in deciding that case the Supreme Court cited and followed Irvine v. Lumberman's Bank, supra, and· called attention to the fact that the contract relation between the state and corporation precluded third parties from setting up a breach of such contract relations, when the state had not seen fit to raise such question. In that regard it was said:

"But the appellant, by its counsel, insists that the act of 1871 warrants a) much wider investigation into causes of forfeiture than those which may ap-

pear merely from the conditions and limitations of a charter. In other words, the position of the commonwealth, as in a writ of quo warranto, may be assumed, and the mere nonuser of the franchise proved, in order to establish a forfeiture of the defendant's right to act under its charter. But to this we cannot agree. We are inclined to think that a forfeiture for such reason as this rests wholly with the state, and that to this extent, at least, the doctrine as stated in the cases of Irvine v. Lumbermen's Bank, 2 Watts & S. (Pa.) 204, and Dyer & Co. v. Walker, 40 Pa. 157, still prevails. The act of 1871 contemplates nothing more than that it shall be made to appear from the charter that the corporation has the power to do the particular act in controversy, and which involves some right of the contestant; but, when we get beyond this, we assume something with which we have no business in a collateral proceeding. We assume to assert the rights of a third party, the commonwealth, who may or may not, at her own option, insist upon the observance of those rights. The commonwealth and the Greenwood Railroad Company are like any other contracting parties. A contract may be forfeited by the laches of one of the parties to it; but, if the other does not choose to insist upon that forfeiture, no one else can take advantage thereof. The appellant alleges that the appellee has omitted to do something that it ought to have done under its contract with the state, and in consequence of which the state may move to have that contract annulled. Well, let it so be that the commonwealth may move for a rescission of this contract, yet by what warrant does the Western Pennsylvania Company assume to control the will of the commonwealth and to use the rights of the state for its own purposes? The commonwealth has put no limit, in the way of time, upon the exercise of the franchise granted to the defendant, and it is but an assumption on part of the appellant to suppose that, for the promotion of its own welfare, it can impose such a limit."

Following this was Philadelphia and Merion's Appeal, 187 Pa. 126, 40 Atl. 967 (1898), where the charter of a turnpike company gave it the franchise to construct and operate a street railway on its roadbed. This franchise it had never exercised. It was there contended the turnpike company had lost such franchise by its failure, for 38 years, to exercise the same. The Supreme Court, however, held:

"The right claimed by the appellee is a corporate franchise which has been granted by the commonwealth. Whether it has been forfeited by nonexercise or otherwise is a question between the commonwealth and her grantee. If the commonwealth does not choose to exercise her right to assert the forfeiture, the decisions, as we understand them, do not confer that right upon a private litigant. The appellant is such a litigant claiming a result only for its private advantage."

In Olyphant Water Company v. Olyphant Borough, 196 Pa. 556, 46 Atl. 897, the court after saying:

"We have uniformly held that the validity of a charter for a public purpose cannot be determined in a collateral proceeding by a private suitor. It can be done only in a direct proceeding to which the commonwealth is a party"

—referred to its late case of Downingtown v. Downingtown, 193 Pa. 255, 44 Atl. 282, wherein it is said:

"That the forfeiture of the plaintiff's charter cannot be inquired into or considered in this collateral proceeding is so thoroughly established by numerous and familiar decisions that even a reference to them is not necessary."

The plaintiff, however, while not denying that under these decisions a charter cannot be invalidated by a third person in a collateral pro-

ceeding, still contends that the principle of those decisions does not apply, but that the facts of the present case bring it under the principle of Jessup v. Loucks, 55 Pa. 360. Now, while it is true that literally and formally the plaintiff does not here seek to annul the defendant's charter, nevertheless it actually does seek to put an end to a franchise on the use of which the defendant's continued corporate life depends. But apart from this, a study of the cases cited by plaintiff's counsel shows they were decided on their own particular facts, and involved no general principle applicable to the case before us. For example, the case of Jessup v. Loucks, supra, was not one seeking to annul a charter or invalidate a franchise, and therefore we find it is never referred to in the cases we have cited on the annulling and invalidating of the franchise or charter of a corporation. On the contrary, the crucial point in Jessup v. Loucks was the existence of an alleged prescriptive right of the plaintiff, which it was alleged to have acquired from a certain chartered company which was not a party to the suit. As in that case, such company had abandoned the dam itself, and the plaintiff had built a new one, it was held first that:

"The works being abandoned, the authority of the company over them ceased with the user, and the easement acquired (in that case the right to flood defendant's land) reverted to the owners of the property from whom taken; * * *" and "secondly, the grant itself (in that case being 'the free, full, and uninterrupted use of all the water that shall not be wanted to carry on the purposes of said navigation,' etc.) being of an incident connected with or arising out of the principal object in granting the charter to the company, must necessarily expire with the principal, and cease when that ceases."

It will thus be seen the case was wholly different from the present. There the original company was not concerned. Twenty years before, as stated in the opinion, it "had ceased to maintain their works as a public highway, and permitted them to go out of repair and to fall into entire disuse." The fact of the abandonment of the dam itself was the ratio decidendi in Jessup v. Loucks, for as there said by the court:

"The fact of the abandonment by the corporation of its works was all the plaintiff had to concern himself about in this case. It is that fact which gives rise to the principle that abandoned easements [in that case, the easement of flooding the plaintiff's land] return or revive to the original owners. This position, therefore, does not present the case of a collateral impeachment of the existence of the corporation, as contended for by the defendants in error."

It will thus be seen that case fundamentally differs from the present. There the dam itself had been abandoned and the company did not assert its franchise to erect one. Here the dam is not abandoned, and the company asserts the franchise of the state to continue to maintain its dam. If in that case the Codorus Navigation Company had been maintaining its dam, as is the Susquehanna Boom Company in this case, it would seem the decision would have been other than it was. In view of the fact that this most relied on case cited by the plaintiff has no controlling pertinence to the present question, we refrain from discussing the other cases cited by counsel.

The judgment below is affirmed.